UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DOMINIQUE DIORIO, Administrator of the Estate of Joseph Diorio,<br><br>Plaintiff,<br><br>v.<br><br>SUPERINTENDANT LAUREL R. HARRY, et al.,<br><br>Defendants. | CIVIL ACTION NO. 1:16-CV-01678<br><br>(MEHALCHICK, M.J.)[1] |

**AMENDED MEMORANDUM OPINION**

Plaintiff Dominique Diorio ("Plaintiff"), as administrator of the estate of her late husband, Joseph Diorio, filed a civil rights complaint on May 13, 2016, asserting federal claims under 42 U.S.C. § 1983, as well as state claims, against prison medical staff and officials for allegedly causing Diorio's death. Presently before the Court is Plaintiff's motion for leave to amend her complaint, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to remove Deputy Superintendents Shawn Kephart and Barry Smith from this action, add 13 new defendants, and advance additional allegations as well as new – or revised – theories of liability. (Doc. 78; Doc. 82). Defendants oppose Plaintiff's motion. (Doc. 83).

For the following reasons, Plaintiff's motion for an order granting leave to amend her complaint (Doc. 78) is **GRANTED IN PART** and **DENIED IN PART**.

---

[1] In January 2018, the parties consented to the undersigned's jurisdiction to adjudicate all pretrial and trial proceedings relating to the action. (Doc. 35).

**I.    BACKGROUND AND PROCEDURAL HISTORY**

    A.  ORIGINAL COMPLAINT

The allegations in Plaintiff's original complaint begin with May 2014, when Diorio was an inmate at the State Correctional Institution (SCI) at Camp Hill, and his brother, Michael, was an inmate at a different SCI. (Doc. 1, at 6, ¶ 10). Sometime before May 2014, Michael had reported to prison officials that his cellmate had committed certain uninvestigated murders. (Doc. 1, at 6, ¶¶ 12-15). As Michael's reports, i.e., his "snitching," became known through the prison system, inmates began targeting his brother, Diorio, with threats of physical harm. (Doc. 1, at 7, ¶¶ 16-17). Diorio became extremely depressed, exhibiting suicidal ideations, and requested placement in protective custody. (Doc. 1, at 7, ¶¶ 18-19). His requests were denied, and on May 14, 2014, Diorio either committed suicide or was murdered but staged to appear as if he had committed suicide. (Doc. 1, at 7, ¶ 20).

On May 13, 2016, Plaintiff filed a five-count complaint in the United States District Court for the Eastern District of Pennsylvania, alleging, in her first count, that defendants Laurel Harry, Shawn Kephart, Barry Smith, and John Doe Correctional Officers (collectively, "Defendants") were deliberately indifferent in their failure to protect Diorio from himself (in the case of suicide) and from other inmates (in the case of the homicide made to look like a suicide). (Doc. 1, at 7-11). In counts two and three of Diorio's complaint, Plaintiff alleges that Harry, Kephart, and Smith failed to train, supervise, and discipline the John Doe officers and that all Defendants conspired to ignore and cover up inmates' threats of physical harm directed at Diorio. (Doc. 1, at 11-13). In the fourth and fifth counts, Plaintiff asserted now-dismissed wrongful death and survival claims. (Doc. 1, at 13-14).

In June 2016, Defendants moved to dismiss the state law claims on sovereign immunity grounds and sought an order transferring the case to the United States District

Court for the Middle District of Pennsylvania, i.e., the District in which SCI-Camp Hill is located. (Doc. 2). Eastern District Judge Stewart Dalzell denied the motion to dismiss without prejudice but granted an order transferring Plaintiff's case to the Middle District. (Doc. 9). Defendants then filed a motion to dismiss, which motion the Court granted to the extent of dismissing, without prejudice, counts four and five of Plaintiff's complaint. (Doc. 15; Doc. 16; Doc. 23; Doc. 24).

Discovery ensued, and in October 2019, Plaintiff filed the motion for leave to file an amended complaint that is presently before the Court. (Doc. 78).

B. PROPOSED AMENDED COMPLAINT

The proposed amended complaint expands upon the allegations set forth in Plaintiff's original complaint and adds new defendants based on those allegations. On May 5, 2014, Diorio was transported to SCI-Graterford, where he began serving a sentence of from one to three years' imprisonment following a conviction for drug-related offenses. (Doc. 78-1, at 5, ¶ 20). There, he filled out an Initial Reception Mental Health Questionnaire indicating that he had treated with a psychiatrist, suffered from depression following his father's death, been taking psychotropic and illegal drugs, and been consuming alcohol within days of being placed in SCI-Graterford. (Doc. 78-1, at 6, ¶ 21). Two suicide-risk-indicator checklists were completed the same day: the first reflected the presence of three suicide risk indicators based on Diorio's having exhibiting signs of depression, his newly born daughter, and a new detainer affecting his legal status, while the second checklist reflected the presence of one suicide risk indicator (the new detainer). (Doc. 78-1, at 6, ¶¶ 22-23).[2]

---

[2] According to Plaintiff, the screening form indicates that "if any items are circled yes," a psychologist must immediately assess the inmate. (Doc. 78-1, at 6, ¶ 24).

Four days after his arrival at SCI-Graterford, Diorio was transferred to SCI-Camp Hill and assessed through an Intra-System Transfer Reception Screening during which his mental health status was marked for depression. (Doc. 78-1, at 6, ¶¶ 26-27). While proposed defendants Beth Herb and Lucan Malishchak testified at their depositions that an inmate's medical and mental health records are transferred "with the inmate whenever an inmate is transferred to another prison," LPN Mackie and Registered Nurse (RN) Ezioma Onwukanjo testified that they never received Diorio's health records. (Doc. 78-1, at 7, ¶¶ 28-29). On the same day of his screening assessment, i.e., May 9, 2014, Diorio was given a psychology referral based on a "history of anxiety and depression." (Doc. 78-1, at 7, ¶ 30).

Then, on May 10, 2014, Diorio had a verbal confrontation with a corrections officer. (Doc. 78-1, at 7, ¶ 33). During a related administrative hearing, Diorio stated that he wished to be placed in protective custody because he feared for his life," given that other inmates had been calling him a "faggot and a child molester." (Doc. 78-1, at 7, ¶ 33). The same day, Mackie completed a suicide risk indicator checklist in which she circled a suicide risk indicator based on Diorio's newly born child. (Doc. 78-1, at 7, ¶ 34). Though Mackie noted a suicide risk factor (Diorio's newly born daughter), which should have resulted in Diorio being seen by additional nursing staff and a shift commander, Mackie unilaterally determined that Diorio could be placed in the RHU. Ultimately, Diorio was placed in an SCI-Camp Hill Restrictive Housing Unit (RHU). (Doc. 78-1, at 8, ¶¶ 35-37). Plaintiff alleges that Diorio should have been placed under heightened observation and not simply placed in the RHU, as Harry and various proposed correctional officer-defendants – William Warner, James Simms, James Prebich, Anthony Ricci, Blaine Hugney, and Michelle Nardozzi – "had access to information, well circulated in the prison, that Diorio was a suicide risk . . . ." (Doc. 78-1, at

4

8, ¶ 38).

According to Plaintiff's proposed pleading, it was because of "Mackie's decision and the lack or [*sic*] supervision over her by certified psychological clinical staff" that "Diorio spen[t] four days in the RHU without any psychological evaluation or treatment" and "limited staff observation," deteriorated psychologically, and "took his own life by hanging himself on May 14, 2014." (Doc. 78-1, at 8, ¶ 39).

With her proposed amended complaint, Plaintiff seeks to dismiss Kephart and Smith from this action and add the following defendants: LPN Mackie; RNs Ezioma Onwukanjo and Uza Jesusa Jacoby; Joseph Silva, Director of Nursing for the Department of Corrections (DOC); Beth Herb, SCI-Camp Hill's Health Care Administrator; Doctor R. Laurence, an SCI-Camp Hill medical doctor; Doctor Lucan Malishchak, DOC's Director of Mental Health; RHU Lieutenant William Warner; Shift Commander Captain James Simms; RHU Sergeant James Prebich; and RHU Corrections Officers Anthony Ricci, Blaine Hugney, and Michelle Nardozzi (collectively, "Proposed Defendants"). (Doc. 78-1, at 3-5, ¶¶ 2-15). Plaintiff asserts three causes of action, paralleling, to varying degrees, the first three causes of action asserted in the original complaint: (1) Proposed Defendants were deliberately indifferent to Diorio's need for precautions against suicide and failed to protect Diorio from harm; (2) Silva, Laurence, Herb, Malishchak, and Harry failed to train, supervise, discipline, and institute policy and procedure under *Monell*; and (3) Harry and unknown corrections officers conspired to "ignore and 'cover up' the suicide risk of [] Diorio." (Doc. 78-1, at 9-14, ¶¶ 40-75).[3]

---

[3] In her third count, Plaintiff also asserts claims against the two defendants she wishes
*(footnote continued on next page)*

**II.    LEAVE TO AMEND**

Rule 15 of the Federal Rules of Civil Procedure governs motions to amend a complaint. Rule 15 provides for three ways by which a plaintiff may potentially amend a complaint: (1) as a matter of course; (2) with the opposing party's written consent; or (3) by leave of court. Fed. R. Civ. P. 15(a)(1)-(2). Here, Plaintiff seeks to amend her complaint pursuant to Rule 15(a)(2), pursuant to which "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason . . . the leave sought should, as the rules require, be 'freely given.'"). However, even under this liberal standard, a motion for leave to amend may be denied when justified. Permissible justifications for denial of leave to amend include: (1) undue delay; (2) bad faith or dilatory motive; (3) undue prejudice to the opposition; (4) repeated failures to correct deficiencies with previous amendments; and (5) futility of the amendment. *Riley v. Taylor*, 62 F.3d 86, 90 (3d Cir. 1995).

Plaintiffs seeking to invoke Rule 15(a)(2) long after claims have accrued may be required to overcome an additional hurdle: if the newly added claims are time-barred, the plaintiff must demonstrate that the amended complaint meets the conditions provided in Rule 15(c). That is, "Rule 15(c) can ameliorate the running of the statute of limitations on a claim by making the amended claim relate back to the original, timely filed complaint." *Singletary v. Pennsylvania Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001). To establish that a claim relates back, the Plaintiff must show that "the claim or defense asserted in the amended pleading

---

to dismiss from this action, Kephart and Smith. (Doc. 78, at 2, ¶ 2(a)). As she has specifically indicated she wishes to remove these defendants from her claim and, in fact, removed them from the caption in her proposed amended claim, (Doc. 78-1, at 1), Plaintiff cannot also argue that these defendants should be included in the Court's analysis of her motion.

6

arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading[.]" Fed. R. Civ. P. 15(c)(2). Additionally, when an "amendment changes the party or the naming of the party against whom a claim is asserted," the party to be brought in by amendment (1) "must have received notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits"; and (2) "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." Fed. R. Civ. P. 15(c)(3).

### III. DISCUSSION

Defendants argue that the bases upon which Plaintiff seeks to amend her complaint are untrue, that Plaintiff knows the bases to be untrue and is therefore proceeding on her motion in bad faith, and that the proposed amendments consist of futile grounds for liability.

#### A. BAD FAITH

The "scope of the . . . [Rule 15 bad faith] inquiry is [] limited to whether the motion to amend itself is being made in bad faith, not whether . . . conduct outside the motion to amend amounts to bad faith." *Trueposition, Inc. v. Allen Telecom, Inc.*, No. CIV.A.01-823 GMS, 2002 WL 1558531, at *2 (D. Del. July 16, 2002) (citing *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 614 (3d Cir. 1987)). Stated differently, the question of bad faith requires that the Court "focus on the [Plaintiff's] motives for not amending [her] complaint . . . earlier[.]" *Adams*, 739 F.2d at 868.

Having thoroughly reviewed the parties' submissions and Plaintiff's proposed amended complaint, the Court finds no grounds for finding that Plaintiff seeks leave to amend in bad faith. "Nothing [Defendants] ha[ve] presented suggests willful or deliberate conduct, the elements necessary for bad faith, on the part of Plaintiff in bringing the motion. Clearly,

[Defendants] disagree[] with the merits of [Plaintiff's] allegations, but that is not enough to show bad faith." *See, e.g.*, *Roquette Freres v. SPI Pharma, Inc.*, No. C.A. 06-540GMS, 2009 WL 1444835, at *5 (D. Del. May 21, 2009). To "deny [P]laintiff's amendment, and thus preclude [consideration of] the merits, on the grounds of undue delay and bad faith alone, this [C]ourt would need the very clearest evidence of abuse by [P]laintiff . . . ." *See Penn Galvanizing Co. v. Lukens Steel Co.*, 65 F.R.D. 80, 82 (E.D. Pa. 1974). There is no clear evidence of abuse on the record presently before the Court.

B. FUTILITY

Amendment of a complaint "is futile when the amended claims would not survive a motion to dismiss . . . ." *Developers Sur. & Indem. Co. v. Mathias*, No. 1:12-CV-2216, 2014 WL 4916135, at *1 (M.D. Pa. Sept. 30, 2014). Futility "means that the complaint, as amended, would fail to state a claim upon which relief could be granted" and is reviewed "under the same standard of legal sufficiency as applies under [Rule 12(b)(6) of the Federal Rules of Civil Procedure]." *Kenny v. United States*, 489 F. App'x 628, 633 (3d Cir. 2012) (internal quotation marks omitted). The Court must therefore "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted).

1. Section 1983

Plaintiff's complaint asserts a federal civil rights claim against several Defendants pursuant to 42 U.S.C. § 1983. Section 1983 provides a private cause of action with respect to violations of federal constitutional rights. The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or

8

> causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .
>
> 42 U.S.C. § 1983.

Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985).

A "defendant in a civil rights action 'must have personal involvement in the alleged wrongs to be liable,' and 'cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'" *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (internal citations omitted). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). An allegation seeking to impose liability on a defendant based on supervisory status, without more, will not subject the official to § 1983 liability. *Padilla v. Beard*, No. CIV. 1:CV-06-0478, 2006 WL 1410079, at *3 (M.D. Pa. May 18, 2006); *Rode*, 845 F.2d at 1207.

A limited exception to the personal-involvement requirement is reflected in the holding of *Monell v. Dep't of Soc. Servs.*, where the Supreme Court held "that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. 658, 690 (1978). Under *Monell*, a municipality – or a private corporation contracted by the municipality – may be held liable when the execution of a policy or custom of such municipality or corporation "inflicts the injury" for which the plaintiff seeks redress. *Monell*, 436 U.S. at 694; *see Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d

Cir. 2003). The holding in *Monell*, however, is restricted to municipalities and local government units and does not extend to states, entities considered arms of the state, nor state officials in their official capacity. *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990) ("The [] Court's conclusion that section 1983 suits could not be brought against state officials in their official capacity followed from the Court's earlier Eleventh Amendment decisions."), *aff'd*, 502 U.S. 21 (1991). Therefore, claims against state correctional facilities and their correctional officials (when acting in an official capacity) fall outside the scope of *Monell* liability. *See, e.g.*, *Bush v. Rendell*, 533 F. App'x 141, 143 (3d Cir. 2013) (rejecting *Monell* claims against "Commonwealth Defendants," including DOC and SCI superintendents, as "barred by the Eleventh Amendment"); *Keys v. Carroll*, No. 3:10-CV-1570, 2012 WL 1191620, at *2 (M.D. Pa. Apr. 10, 2012) (noting that "sovereign immunity precludes a *Monell* claim against Pennsylvania's Department of Corrections [] or a State Correctional Institution").

### 2. Deliberate Indifference Claims against Proposed Defendants

In the first count of her proposed amended complaint, Plaintiff asserts Eighth Amendment claims against Proposed Defendants for "deliberate indifference to the need for precautions against suicide and failure to provide inmate protection . . . ." (Doc. 78-1, at 9). As general bases for these claims, Plaintiff alleges that Proposed Defendants "were aware of Diorio's deteriorating psychological state and had ample documented evidence of his potential for suicide"; and that, despite such awareness, Proposed Defendants failed "to properly staff, take action to initiate and in a timely and appropriate manner take the necessary precautions to prevent Diorio from committing suicide including having him seen by a licensed clinical staff and put on a higher acuity cell observation." (Doc. 78-1, at 9, ¶¶ 43-44).

A plaintiff who "seeks to hold a prison official liable for failing to prevent an inmate's suicide" must plead allegations establishing *prima facie* three elements:

> (1) that the individual had a particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility, that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.

*Alexander v. Monroe Cty.*, 734 F. App'x 801, 803–04 (3d Cir. 2018).

A "'strong likelihood' of suicide 'must be so obvious that a lay person would easily recognize the necessity for preventative action.'" *Alexander*, 734 F. App'x at 804 (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1025 (3d Cir. 1991)). Whether "the custodial officials 'knew or should have known' can be demonstrated when the officials have 'actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities.'" *Cruise v. Marino*, 404 F. Supp. 2d 656, 669 (M.D. Pa. 2005) (quoting *Colburn*, 946 F.2d at 1025 n.4)). Moreover, "[t]here can be no reckless or deliberate indifference to [such a] risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Colburn*, 946 F.2d at 1025.

First, as to RN Jacoby, Plaintiff's allegations are virtually nonexistent, as the only references to Jacoby in the amended complaint are in the caption, a paragraph explaining that Jacoby is a nurse at SCI-Camp Hill, and the heading of count one. (Doc. 78-1, at 1, 3, 9). These allegations are insufficient to establish a *prima facie* claim against Jacoby. *See, e.g.*, *Fennell v. Wetzel*, No. 4:17-CV-1520, 2019 WL 1264898, at *8 (M.D. Pa. Jan. 18, 2019) ("Initially, Fennell has failed to plead any factual allegations concerning defendant E. Speck. Speck is not mentioned anywhere in the complaint other than in the caption. . . . Fennell has not pleaded any allegations that would suggest Speck was personally involved in the alleged

11

wrongs."), *report and recommendation adopted*, No. 4:17-CV-01520, 2019 WL 1255183 (M.D. Pa. Mar. 19, 2019). Similarly, as to RN Onwukanjo, Plaintiff only includes one allegation that Onwukanjo testified to having never received Diorio's "previous medical and mental health records" during Diorio's placement at SCI-Camp Hill. (Doc. 78-1, at 7, ¶ 28). There is no other allegation of any involvement by Onqukanjo. Accordingly, Plaintiff's proposed addition of claims against Jacoby and Onwukanjo is futile because the allegations fail to state a claim under Rule 12(b)(6).

However, as to Corrections Officers Warner, Simms, Prebich, Ricci, Hugney, and Nardozzi, assuming the veracity of Plaintiff's allegations, and reviewing them in the context of this complaint, the the claims have facial plausibility and give the Defendants fair notice of what the…claim is and the grounds upon which it rests. Plaintiff alleges that these six defendants were SCI-Camp Hill corrections officers in charge of inmate security during the relevant period, i.e., May 2014. (Doc. 78-1, at 11, ¶ 59). Plaintiff further alleges that they (1) were aware of Diorio's "deteriorating mental health condition" because "documents in their possession clearly indicated that Diorio was at risk for suicide"; (2) "fail[ed] to take action to initiate, in a timely and appropriate manner, heightened observation of Diorio while he was housed in the RHU"; and (3) "allowed Diorio to be placed in the RHU" knowing his mental health condition "would likely deteriorate resulting in suicide." (Doc. 78-1, at 11, ¶¶ 60-62).

Although following discovery in this matter, these Defendants (and others) may be entitled to judgment in their favor before trial,[4] the Court is unable to discern at this juncture,

---

[4] Although "conclusory" or "bare-bones allegations" will not survive a motion to dismiss, a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits. *White v. Brommer*, 747 F. Supp. 2d 447, 457 (E.D. Pa. 2010) (citations omitted).

12

and under the specific circumstances in this case, whether or not Plaintiff will be able to ultimately prove his case, and the liability of the Defendants named. *See Ponzini v. Monroe Cty.*, 897 F. Supp. 2d 282, 289 (M.D. Pa. 2012).

A similar conclusion is compelled concerning Plaintiff's claims against Harry, Malishchak, Herb, Silva, and Laurence. Plaintiff alleges that these defendants (1) were responsible for the training and supervision of corrections officers' custody and care of inmates (Harry), psychological staff (Malishchak), corrections officers' transfer and maintenance of DOC-inmates' medical and psychological records (Herb), and nursing and medical staff (Silva, Laurence); (2) were deliberately indifferent to "the lack of training, policy, record maintenance and protocol regarding the custody and care of inmates who were at risk for suicide"; (3) knew that "untrained and unsupervised correctional officers and medical staff . . . were regular [*sic*] making untrained and unqualified clinical medical decisions regarding which inmates would be assessed by 'clinical staff' and were thus wrongly denying . . . heightened suicide observation in the RHU." (Doc. 78-1, at 10-11, ¶¶ 50-58). Plaintiff further alleges that these defendants (1) were responsible for various aspects of inmate safety and medical training, supervision, and discipline at SCI-Camp Hill; (2) failed, as a matter of policy and practice, to institute directives or supervision by deliberately ignoring unsupervised and unqualified staff making critical unauthorized decisions concerning psychological services and heightened suicide observation; (3) failed, as a matter of policy and practice, "to train, supervise, and/or discipline [corrections officers]" and "thus encourage[ed] [such officers] to . . . be[] deliberately indifferent and willfully ignor[e]" Diorio's risk of committing suicide"; and (4) were on actual notice of the need to institute policy due to "other similar incidents occurring in the past in which inmates were woefully

13

unprotected from suicidal risk that resulted in bodily injury or death." (Doc. 78-1, at 13, ¶¶ 66-69). The Court finds that the proposed amended complaint adequately alleges claims against these defendants.

Finally, as to Defendant Mackie, Plaintiff has sufficiently alleged both Mackie's personal involvement – Mackie took part in a suicide risk evaluation of Diorio and allegedly had a role in determining what steps to take based on that evaluation – and facts, which presumed true and considered in a light most favorable to Plaintiff, lead the Court to conclude that the claim against Mackie is adequately pleaded.  Defendants' arguments against granting leave to amend to add allegations concerning Mackie are largely based on the contention that this case is "unique" because "robust discovery has taken place." Defendants, in other words, "make[] a futility argument that [Plaintiff] has no factual basis for [her] claim[s] . . . ." *See Mt. Laurel Concrete, Inc. v. Orleans Homebuilders, Inc.*, No. CV 08-1553 (JEI), 2009 WL 10689741, at *2 (D.N.J. Feb. 23, 2009). Such "an argument requires the Court to consider matters outside the pleadings. This is proper for a motion for summary judgment and not a motion to dismiss, the standard under which a futility argument is decided." *See Mt. Laurel Concrete, Inc. v. Orleans Homebuilders, Inc.*, No. CV 08-1553 (JEI), 2009 WL 10689741, at *2 (D.N.J. Feb. 23, 2009). "Whatever merit there may be in Defendants' arguments (a point which the Court cannot presently decide), Defendants' arguments rely on facts outside of the [proposed amended] complaint," whereas "the futility of a proposed amendment must be evident from the pleading itself." *See Gilson v. Pennsylvania State Police*, No. 1:12-CV-00002, 2013 WL 5671189, at *6 (W.D. Pa. Oct. 16, 2013).

### 3. Conspiracy to Ignore and Cover Up Suicide Risk Claims

Plaintiff's application for leave to amend the third count is essentially non-issue

because the allegations in the proposed amended complaint are identical to those pleaded in the original complaint. (*See* Doc. 1, at 12-13; Doc. 78-1, at 14). However, Plaintiff will be permitted to amend this count to remove Kephart and Smith as defendants.

IV. **CONCLUSION**

For the foregoing reasons, it is hereby ordered Plaintiff's motion for leave to amend (Doc. 78) is **GRANTED IN PART** and **DENIED IN PART** to the extent indicated below:

1. Plaintiff is granted leave to amend her pleading to assert the proposed claims included in the proposed amended complaint except for those proposed to be brought against Jacoby and Onwukanjo;

2. Defendants Shawn Kephart and Barry Smith are terminated from this action;

3. Plaintiff shall file her amended pleading within 21 days of the date of the Court's Order issued contemporaneously with this Memorandum Opinion;

4. Any amended pleading shall be filed to the same docket number as the instant action, shall be entitled "First Amended Complaint," and shall be complete in all respects. It shall be a new pleading which stands by itself as an adequate complaint under the Federal Rules of Civil Procedure, without reference to the initial complaint;

5. In the absence of a timely-filed amended complaint, the above-captioned action shall proceed on the original complaint.

Dated: February 24, 2021    *s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**