# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

DOMINIQUE DIORIO,

|                                    | CIVIL ACTION NO. 1:16-CV-01678 |
|------------------------------------|---|

Plaintiff,

v.

(MEHALCHICK, M.J.)

SUPERINTENDENT LAUREL R.
HARRY, et al.,

Defendants.

## <u>MEMORANDUM</u>

Before the Court in this civil rights case is a motion for summary judgment filed by the Defendants: Laurel Harry, Joseph Silva, Lucas Malishchak, Beth Herb, Katherine Mackie, Liza Jacoby, James Simms, William Warner, James Prebich, Anthony Ricci, Blaine Hugney, and Michelle Nardozzi. (Doc. 98, at 1).[1] Defendants move to dismiss Plaintiff's claim of deliberate indifference to Plaintiff's late husband's risk of suicide on the grounds that he did not show signs of particular vulnerability to suicide. (Doc. 100, at 8). For the reasons set forth herein, it is ordered that Defendants' motion for summary judgement is **GRANTED**.

I. **BACKGROUND AND PROCEDURAL HISTORY**

The following background is taken from Defendants' Undisputed Statement of Material Facts. (Doc. 99, at 1-11). The Court will note where a fact is in dispute. Pursuant to Local Rule 56.1, a statement of material fact that is "disputed" shall be deemed admitted if it

---

[1] In her Brief in Opposition to this Motion, Plaintiff voluntarily dismisses her claims against Defendants Jacoby, Laurence, Silva, Warner, Simms, Prebich, Ricci, Hugney, and Nardozzi. (Doc. 101, at 3). Summary Judgment is **GRANTED** as to the claims against Defendants Jacoby, Laurence, Silva, Warner, Simms, Prebich, Ricci, Hugney, and Nardozzi.

includes a reference to the part of the record that supports the statement and the disputing party neglects to provide record support for its position.[2] M.D. Pa. LR 56.1.

This matter is governed by DC ADM 13.8.1.[3] (Doc. 99, ¶ 1). DC ADM 13.8.1 governs the access to mental health care at state facilities. (Doc. 99, ¶ 1). An assessment of an inmate's mental health is part of the intake process when he or she reports to a state facility and upon any transfer. (Doc. 99, ¶ 2). Plaintiff denies that such protocols "were followed by the defendants." (Doc. 105, ¶ 2). Mental health forms, including intake records and forms completed under DC ADM 13.8.1, are considered confidential medical records. (Doc. 99, ¶ 3). Corrections officers do not have access to an inmate's medical records, including Suicide Risk Indicator Checklists. (Doc. 99, ¶ 4). Medical files are not kept on the restricted housing unit. (Doc. 99, ¶ 5).[4]

When an inmate is place in Level 5 Housing Units (also known as the Restricted Housing Unit ("RHU")), an inmate is assessed for suicidal potential using the Suicide Risk Indicators Checklist. (Doc. 99, ¶ 6; Doc. 105, ¶ 6). The top portion, the actual questions to indicate suicide risks, are asked and completed by the escorting officer. (Doc. 99, ¶ 7; Doc. 99-1, at 51). Defendant Mackie also indicated that she has completed the checklist and

---

[2] Plaintiff did not include a statement of material facts within her brief in opposition. (Doc. 101). However, Plaintiff did include a statement of material facts in her sur reply (Doc. 105). In the interest of equity, the Court will use the statement of material facts from Plaintiff's sur reply (Doc. 105) in evaluating Defendants' motion for summary judgement (Doc. 98).

[3] Plaintiff denies this fact and asserts that "[t]he Pennsylvania State Nursing Code dictates what person[ne]l are allowed to administer mental health care." (Doc. 105, ¶ 1).

[4] Plaintiff "denies" the statements regarding the confidentiality of mental health forms, the access corrections officers have to inmates' medical records, and whether medical files are kept on the restricted housing unit. (Doc. 105, ¶¶ 3-5). As Plaintiff cites no record support for her denials, while Defendants do provide record support for their statements, Defendants' statements shall be taken as true. *See* M.D. Pa. LR 56.1.

"signed off on it." (Doc. 105, at 2; Doc. 99-19, at 13-14).  If one or more "yeses" are circled on the Suicide Indicator Checklist, the Officer contacts either psychology, if during working hours, or a member of the nursing staff, if after hours or on weekends.[5] (Doc. 99, ¶ 8).

In 2014, Defendant Beth Herb was employed at SCI Camp Hill as a Registered Nurse;[6] Defendant Dr. Lucas Malishchak was employed with the Department of Corrections as a Corrections Evaluations Supervisor under the Director of Psychology;[7] Defendant Joseph Silva, RN was employed at SCI Waymart as the Health Care Administrator; and Defendant Laurel Harry was the Superintendent for SCI Camp Hill since 2012. (Doc. 99, ¶¶ 9, 10, 11, 12; Doc. 105, ¶¶ 11, 12). Mr. Diorio ("Decedent") reported to SCI Graterford on May 5, 2014. (Doc. 99, ¶ 13; Doc. 105, ¶ 13). During intake, Decedent reported that he did not have a history of suicide attempts. (Doc. 99, ¶ 14; Doc. 105, ¶ 14). Decedent reported that he had seen a psychiatrist following his father's death two years prior in 2012. (Doc. 99, ¶ 15; Doc. 105, ¶ 15). Two Suicide Risk Indicator Checklists were completed on May 5, 2014. (Doc. 99, ¶ 16; Doc. 105, ¶ 16). On Suicide Risk Indicator Checklist 1, Decedent answered "yes" to three questions: he exhibited signs of depression, with the note he felt depressed when asked;" he had a family status change with the note he "had a daughter born the previous month;"

---

[5] The Plaintiff states that "[t]he Instructions clearly state that if any 'yes' is circled, the Officer *shall immediately phone 'nursing and* Licensed Psychology Manager.'" (Doc. 105, ¶ 8). However, Plaintiff omits the Policy's qualifying language of "[b]etween 8:00 AM and 4:30 PM" that is found before this statement and subsection (b) that provides instructions that enlist the help of "the nursing staff and Shift Commander" "[a]fter hours, or on weekends." (Doc. 99-1, at 52).

[6] It is admitted that Defendant Herb was a Registered Nurse employed by SCI Camp Hill in 2014, but it is disputed as to whether or not she was also the healthcare administer for SCI Camp Hill in 2014. (Doc. 105, ¶ 9 ; Doc. 99-2, at 8).

[7] The Plaintiff notes that "it is denied that [Malishchak] did not have supervisorial power as he was working directly with the Director of Psychology." (Doc. 105, ¶ 10).

- 3 -

and he had a legal status change.[8] (Doc. 99, ¶ 17). On Suicide Risk Indicator Checklist 2, Decedent answered "yes" to one question: that he had a recent legal status change with the note that it was new detainer."[9] (Doc. 99, ¶ 18). On May 6, 2014, Decedent sent his wife a letter that stated in order to "fast track" he couldn't take any meds, so he told Department staff that he had no history of drugs or depression. (Doc. 99, ¶ 19; Doc. 105, ¶ 19).

On May 9, 2014, Decedent was transferred to SCI Camp Hill. (Doc. 99, ¶ 20; Doc. 105, ¶ 20). Decedent was assessed using the Intra-System Transfer Reception Screening form. (Doc. 99, ¶ 21; Doc. 105, ¶ 21). Decedent did not have thoughts of hurting himself or others, a history of self-harm, or a history of depression.[10] (Doc. 99, ¶ 22, 23, 24; Doc. 105, ¶¶ 22, 24). Because of this history of depression and anxiety, Decedent was placed on a list for follow-up by the psychology department. (Doc. 99, ¶ 25; Doc. 105, ¶ 25). Decedent denied being on any medication. (Doc. 99, ¶ 26; Doc. 105, ¶ 26). Because Decedent was not on medication, he was not referred for a psychiatric follow up. (Doc. 99, ¶ 27; Doc. 105, ¶ 27).

On May 10, 2014 at 0830 Officer Kenneth O'Leary issued Decedent Misconduct Number A832793 because Decedent refused to leave a bench in the medical area and swore at Officer O'Leary. (Doc. 99, ¶ 28; Doc. 105, ¶ 28). Decedent did not tell Officer O'Leary that

---

[8] Plaintiff denies "that this was the 1st Suicide Risk Indicator Checklist that Decedent completed on May 5, 2014, as there is no time indicated on the document." (Doc. 105, ¶ 17; Doc. 99-10, at 1).

[9] Plaintiff denies "that this was the 2nd Suicide Risk Indicator Checklist that Decedent completed on May 5, 2014." (Doc. 105, ¶ 18; Doc. 99-11, at 1).

[10] Plaintiff states that "there is no language in the form describing 'self-harm.'" (Doc. 105, ¶ 23; Doc. 99-13). However, there is language pertaining to "a history of suicide attempts . . . [and] evidence of self-mutilation" which the Court believes to fall under the category of "self-harm." (Doc. 99-13, at 2).

other inmates were calling him a faggot or child molester.[11] (Doc. 99, ¶ 29). Decedent was put in the RHU pending a hearing on the misconduct.[12] (Doc. 99, ¶ 30). Lieutenant David Lee completed a third Suicide Risk Indicator Checklist. (Doc. 99, ¶ 31; Doc. 99-18, at 1; ; Doc. 105, ¶ 31). Decedent reported "yes" to having a recent family change: the birth of his daughter the previous month. (Doc. 99, ¶ 32; Doc. 105, ¶ 32). Because May 10, 2014 was a Saturday, a member of the nursing staff – Nurse Mackie – was called for follow up for the "yes" answer. (Doc. 99, ¶ 33; Doc. 105, ¶ 33). Mackie recorded on the Suicide Risk Indicators Checklist that Decedent denied having suicidal ideations, homicidal ideations, and audiovisual hallucinations. (Doc. 99, ¶ 34; Doc. 99-18, at 1; Doc. 105, ¶ 34). Decedent did not tell Mackie that he wanted protective custody, that he feared for his life, or that inmates were calling him a faggot and child molester.[13] (Doc. 99, ¶ 35). Mackie did not recall seeing the Initial Reception Health Questionnaire, his medical record, or the two prior Suicide Risk Indicator Checklists prior to speaking with Decedent. (Doc. 99, ¶ 36; Doc. 99-18, at 25, 31, 49; Doc. 105, ¶ 36). Mackie did not think Decedent presented a threat to himself. (Doc. 99, ¶ 37; Doc. 105, ¶ 37). On May 13, 2014, Decedent had a Misconduct Hearing in front of Hearing Examiner Tony Kot. (Doc. 99, ¶ 38; Doc. 105, ¶ 38). During the hearing, Decedent reported to Hearing Examiner Kot that he wanted protective custody, that he feared for his life, and other inmates were calling him names. (Doc. 99, ¶ 39; Doc. 105, ¶ 39). Hearing Examiner

---

[11] Plaintiff denies this fact but does not provide any citation to the record as to why this fact is denied. (Doc. 105, ¶ 29; Doc. 99-17, at 5).

[12] Plaintiff states that Decedent "was placed in RHU after his hearing," but does not provide any citation to the record evidencing this point. (Doc. 105, ¶ 30; Doc. 99-6, at 67).

[13] When asked if she had knowledge or if she recalled if she had any knowledge of Diorio's iterations, Mackie stated "[n]o." (Doc. 99-19, at 24).

Kot did not verbally report that Decedent feared for his life to anyone.[14] (Doc. 99, ¶ 40; Doc. 99-21, at 7; Doc. 105, ¶ 40).

Defendant Lieutenant Warner did not see Suicide Checklist 3, any of Decedent's intake forms or his medical files, or the Hearing Examiner's report related to Decedent.[15] (Doc. 99, ¶ 41, 42, 43; Doc. 105, ¶¶ 41, 42, 43). Defendant Officer Ricci did not see the Hearing Examiner's report related to Decedent on May 14, 2014. (Doc. 99, ¶ 44; Doc. 105, ¶ 44). Defendant Officer Hugney was not told that Decedent feared for his life. (Doc. 99, ¶ 45; Doc. 99-23, at 7; Doc. 105, ¶ 45). Defendant Sergeant Prebich did not see the Hearing Examiner's Report or any of the suicide risk indicator checklists. (Doc. 99, ¶ 46, 47, 48; Doc. 105, ¶¶ 46, 47, 48). Defendant Officer Nardozzi never saw Decedent's initial reception mental health questionnaire, any of Decedent's Suicide Risk Indicator Checklists, or the Hearing Examiner's Report. (Doc. 99, ¶ 49, 50, 51; Doc. 99-25, at 10; Doc. 105, ¶¶ 49, 50, 51).

Ricci, who was assigned to the RHU, found Decedent when he was conducting count on the second tier A side of the RHU on May 14, 2014. (Doc. 99, ¶ 52; Doc. 105, ¶ 52). Ricci notified Warner by yelling there was a medical emergency. (Doc. 99, ¶ 53; Doc. 105, ¶ 53). Warner called medical for assistance. (Doc. 99, ¶ 54; Doc. 105, ¶ 54). Hugney responded to the medical emergency call and retrieved a cutting tool. (Doc. 99, ¶ 55; Doc. 105, ¶ 55). Nardozzi responded to the medical emergency call. (Doc. 99, ¶ 56; Doc. 105, ¶ 56). Ricci and Hugney attempted CPR. (Doc. 99, ¶ 57; Doc. 105, ¶ 57). Prebich responded to the medical

---

[14] In his deposition, Kot notes that "there [were] Camp Hill staff in the hearing room" during Decedent's hearing and that Kot alerted the staff at Camp Hill of Decedent's statement "by writing down what [Kot's] say is." (Doc. 99-21, at 7).

[15] Plaintiff notes that Defendants Warner, Ricci, Hugney, Prebich, and Nardozzi are no longer defendants in this case. (Doc. 105, ¶¶ 41-51).

emergency call and assisted in the preparation of a defibrillator. (Doc. 99, ¶ 58; Doc. 105, ¶ 58). An Employee Report of Incident was completed by each individual who responded to the emergency and was submitted to Defendant Captain Simms. (Doc. 99, ¶ 59; Doc. 105, ¶ 59). On May 16, 2014, Diorio's death was reported to the media via a press release. (Doc. 99, ¶ 60; Doc. 105, ¶ 60). The Pennsylvania State Police conducted an investigation. (Doc. 99, ¶ 61; Doc. 105, ¶ 61). Frederick Jenkins, a Licensed Psychologist Manager for SCI Camp Hill, oversaw a Clinical Suicide Review, which was a four-page report to the head of the Bureau of Psychology Services about Decedent's suicide. (Doc. 99, ¶ 62; Doc. 105, ¶ 62). The Review included a panel of sixteen individuals and culminated in a four-page report, plus exhibits, outlining the suicide. (Doc. 99, ¶ 63; Doc. 105, ¶ 63).

II.  **STANDARD OF REVIEW**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

"Although the party opposing summary judgment is entitled to the 'benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact.'"[16] *Velentzas v. U.S.*, No. 4: CV-07-1255, 2010 WL 3896192, *7 (M.D. Pa. August 31, 2010) (quoting *Goode v. Nash,* 241 F. App'x 868, 868 (3d Cir. 2007)) (citation omitted). The opposing party "cannot rest solely on assertions made in the pleadings, legal memorandum, or oral argument." *Goode,* 241 F. App'x at 868 (internal quotation marks omitted). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

---

[16] *See also Beenick v. LeFebvre,* 684 F. App'x 200, 206 (3d Cir. 2017) (stating the purpose of requiring parties to cite to particular parts of the record in their briefs about a motion for summary judgment is to "assist the court in locating materials buried in a voluminous record") (quoting Fed. R. Civ. P. 56(c)(1)(A)).

III.   **DISCUSSION**

In this motion, Defendants assert that they are entitled to summary judgment because Decedent "did not present a particular vulnerability to suicide." (Doc. 100, at 8). Defendants submit that (1) they were not deliberately indifferent because Decedent was not particularly vulnerable to suicide and they did not know of any risk; (2) they had no supervisory liability at the time of Decedent's suicide because Defendants Malishchak, Herb, and Silva were not supervisors at the time and Defendant Harry had no actual knowledge; (3) they are state actors and, therefore, a *Monell* claim cannot stand; (4) there is no underlying constitutional violation and Decedent's suicide was not "covered up"; and (5) they are all entitled to Eleventh Amendment qualified immunity.[17] (Doc. 100, at 17, 26, 30, 31, 35, 36). Plaintiff contends that (1) there is a dispute of material fact as to the credibility within "the depositions, documents, and expert reports taken within discovery"; (2) the Defendants "had access to records that documented [Decedent's] vulnerability to suicide" thus presenting a question of fact "as to whether defendants acted with deliberate indifference towards the threat of suicide"; (3) Defendant Mackie had knowledge of Decedent's vulnerability to suicide "and should not have been making clinical decisions without supervision"; (4) Defendants "ignored vital medical records" and made "unsupervised 'clinical' decisions'" thus making them liable for supervisory liability; (5) there are "serious training and protocol issues within SCI Camp Hill"; (6) the "Defendants are not entitled to qualified immunity" because "they acted with deliberate indifference"; (7) the *Monell* Claim against the Defendants should not be dismissed because the Defendants "failed to affirmatively act despite an obvious need to do so to protect

---

[17] Because the Court finds that the Defendants are entitled to judgment on the merits, the Court does not reach the issue of immunity.

the constitutional rights of [Decedent]"; and (8) Plaintiff has demonstrated a conspiracy claim because the "Defendants deliberately violat[ed] their own policies and protocols." (Doc. 101, at 8, 10, 15, 17, 19, 20, 21).[18]

A. DELIBERATE INDIFFERENCE

Defendants claim that their actions cannot amount to deliberate indifference because Decedent "was not particularly vulnerable to suicide" and Defendant Mackie did not know of any vulnerability to suicide. (Doc. 100, at 18, 21-22). Plaintiff states that Defendants had possession of Decedent's mental health documents which evidenced Decedent's vulnerability to suicide. (Doc. 101, at 10).

The suicide of a pretrial detainee can support a recovery in a 42 U.S.C. §1983 action. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (1991) ("*Colburn II*"); *Plasko v. City of Pottsville*, 852 F. Supp. 1258 (E.D. Pa. 1994); *Simmons v. City of Phila.*, 947 F.2d 1042, 1067 (3d Cir. 1991). Such claims "present [ ] difficult issues because no state actor directly inflicted harm" on the prisoner. *See Carello v. Daniels*, 923 F. Supp. 626, 631 (D. Del. 1995) (quoting *Colburn II*, 946 F.2d at 1023). Instead, a plaintiff must show that state officials were deliberately indifferent in failing to prevent the self-inflicted harm. When a plaintiff seeks to hold a custodial official liable for failing to prevent an inmate's suicide, whether a pre-trial detainee or a convicted prisoner, the plaintiff must show: (1) the individual had a particular vulnerability to suicide, meaning that there was strong likelihood, rather than a mere possibility, of a suicide attempt; (2) the custodial official knew or should have known of that vulnerability; and (3) the official acted with reckless indifference to the individual's particular

---

[18] Plaintiff voluntarily dismisses all claims against Defendants Jacoby, Laurence, Silva, Warner, Simms, Prebich, Ricci, Hugney, and Nardozzi. (Doc. 101, at 3).

vulnerability. *Alexander v. Monroe County*, 734 F. App'x. 801, 804 (3d Cir. 2018); *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017); *Colburn II*, 946 F.2d at 1023.

To constitute a "strong likelihood" of suicide so as to satisfy the first element of a deliberate indifference claim, the risk must be so obvious that a lay person would easily recognize the necessity for preventative action. *Palakovic*, 854 F.3d 222 (quoting *Colburn II*, 946 F.2d at 1025). With presence of such risk, the second element requires the plaintiff to either show subjective knowledge of the vulnerability or that the official should have known that the detainee was particularly vulnerable. *Colburn II*, 946 F.2d at 1024-25. "Should have known," in this context, goes beyond knowledge with ordinary prudence, or negligence, but is less than subjective appreciation of the risk. *Colburn II*, 946 F.2d at 1025 (explaining that a defendant's failure to recognize large prominent scars on a decedent's wrists, elbows, and neck as indicative of suicidal tendencies amounted only to negligence, precluding liability) (citing *Freedman v. City of Allentown*, 853 F.2d 1111, 1116 (3d Cir. 1988)). Deliberate or reckless indifference is a willingness to ignore a foreseeable danger to the detainee's vulnerability, or conscience-shocking behavior in unhurried situations. *Kedra v. Schroeter*, 876 F.3d 424, 446 (3d Cir. 2017) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997); *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015)).

First, Defendants assert that Decedent was not particularly vulnerable to suicide because he did not present any indications that he was depressed and did not possess a deteriorating mental state. (Doc. 100, at 18-20). Plaintiff argues that Decedent's medical documents, Suicide Risk Indicators Checklists, and fearful mindset all presented an indication that Decedent was particularly vulnerable to suicide. (Doc. 101, at 10-12). The signs of suicide presented by Decedent could rise to the level of obviousness such that a lay person should

- 11 -

easily recognize the necessity for preventative action. *See Palakovic*, 854 F.3d 222 (quoting *Colburn II*, 946 F.2d at 1025). Decedent did answer affirmatively to at least one question on each of the three Suicide Risk Indicators Checklists including an affirmative indication that "[i]nmate shows signs of depression (crying, withdrawn, passive)" and a note that states, "feels depressed w/asked." (Doc. 99-10; Doc. 99-11; Doc. 99-18). Additionally, Decedent indicated that he had seen a psychiatrist due to his "dep[ression] from [when his] father pass[ed] away in 2012. (Doc. 99-9). Although some of the affirmative indications and notes appear to be positive or inconsequential, there is a dispute of fact on the issue of whether these factors would create an obvious and serious threat of suicide. *See Est. of Phillips v. Correct Care Solutions, LLC,* No. 19-3822, 2021 WL 288903, at *4 (E.D. Pa. Jan. 28, 2021) (stating that knowledge of a particular vulnerability to suicide exists where there is "an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities.") (internal quotations omitted); *see also Palakovic*, 854 F.3d 222 ("an individual's particular vulnerability to suicide speaks to the . . . strong likelihood that self-inflicted harm will occur.") (internal quotations omitted). Therefore, the Court finds that "Plaintiff[f] ha[s] provided sufficient evidence that a reasonable jury may determine that [Decedent] had a particular vulnerability to suicide." *Brandt v. PrimeCare Med., Inc.,* No. 1:11-CV-1692, 2013 WL 3863936, at *3 (M.D. Pa. July 24, 2013).

Next, Defendants state that Defendant Mackie did not possess actual knowledge of Decedent's vulnerability to suicide, the notion of which Plaintiff contests. (Doc. 100, at 22-25; Doc. 101, at 13-14). Defendants aver that Decedent denied suicidal thoughts to Defendant Mackie and that "she had no other information that would obviously indicate a risk of suicide." (Doc. 101, at 25). The record supports this in that Mackie did not see Decedent's

- 12 -

intake forms and that Decedent "denied suicidal ideations" when asked by Mackie. (Doc. 101, at 23-24). Mackie recorded on the Suicide Risk Indicators Checklist that Decedent denied having suicidal ideations, homicidal ideations, and audiovisual hallucinations. (Doc. 99-18, at 1). Mackie stated in her deposition that she had no knowledge of Decedent's fearful mindset or interactions with other inmates nor did she recall if Decedent spoke of his fearful mindset or his interactions with other inmates. (Doc. 99-19, at 24). Mackie also did not recall seeing the Initial Reception Health Questionnaire, Decedent's medical record, or the two prior Suicide Risk Indicator Checklists prior to speaking with Decedent. (Doc. 99-18, at 25, 31, 49). Plaintiff avers that another R.N. had reviewed Decedent's medical chart and that Mackie "admitted that much of Diorio's medical chart did in fact indicate that he should have been immediately refer to a Psychological Manager before he was placed in the RHU had she seen the charts." (Doc. 101, at 13). Plaintiff identifies no part of the record indicating that Mackie viewed Decedent's medical chart or intake report. Plaintiff only provides evidence that Mackie stated she did not see Decedent's charts. (Doc. 101, at 13). Although Mackie states that she did view the third Suicide Risk Indicators Checklist, this document alone would not provide evidence that Decedent was at risk for suicide because it included a positive family change with the birth of his daughter and Decedent's denial of suicidal ideations. (Doc. 99-19, at 19-21; Doc. 99-18). The record reflects that Mackie did not have had actual knowledge as to Decedent's vulnerability to suicide because she did not view any of the documents that would have pointed to an assumption of such vulnerability. The Court finds that summary judgement in favor of the claims against Defendant Mackie is proper.

Because Plaintiff has failed to demonstrate support within the record that Defendant Mackie possessed actual knowledge of Decedent's particular vulnerability to suicide,

summary judgement in favor of the Defendants is GRANTED as to Plaintiff's claim of deliberate indifference against Defendant Mackie.

B. SUPERVISORY LIABILITY

Defendants claim that they are entitled to summary judgment on Plaintiff's supervisory claim and *Monell* claim. (Doc. 100, at 26, 30). Defendants aver that Defendants Malishchak and Herb were not supervisors at the time of the incident and Defendant Harry did not demonstrate deliberate indifference towards Decedent's care. (Doc. 100, at 27-29). Additionally, Defendants claim that they are state actors and Plaintiff has failed to demonstrate facts indicative of a custom, policy, or practice that infringed upon constitutional rights. (Doc. 100, at 31). Plaintiff argues that Defendants Herb, Malishchak, and Harry were supervisors of medical staff at the time of the incident and were "deliberately indifferent to numerous untrained and illegal employees making devastating medical decisions over vulnerable inmates." (Doc. 101, at 15-17). Additionally, Plaintiff references a Clinical Suicide Report by Frederick Jenkins outlining policy issues at SCI Camp Hill and that Defendants "failed to affirmatively act despite an obvious need to do so to protect the constitutional rights of inmates." (Doc. 101, at 17-18, 20-21).

The Third Circuit has found that "a defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka*, 481 F.3d at 210 (internal citations and quotation marks omitted). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

- 14 -

Claims seeking to impose liability on a defendant based on supervisory status, without more, will not subject the official to § 1983 liability. *Padilla v. Beard*, No. CIV. 1:CV-06-0478, 2006 WL 1410079, at *3 (M.D. Pa. May 18, 2006); *Rode*, 845 F.2d at 1207.

Regardless of whether Defendants Harry, Malishchak, and Herb were supervisors at the time of the incident, the record does not support an assertion that they had personal involvement with Decedent's mental health care prior to his suicide. (Doc. 99-3; Doc. 99-7; Doc. 99-2). Plaintiff does not point to any evidence in the record suggesting direct knowledge or direction as to Decedent's mental health care while he was incarcerated. (Doc. 101, at 15-17). Vicarious liability without any factual allegations of personal involvement is insufficient to assert an Eighth Amendment claim against a Defendant. *See Phillips*, 687 F. App'x at 131. Therefore, the Court turns to whether there is an issue of fact regarding a policy or custom through which the Defendants may be held liable.

C. *Monell* Liability

In some instances, a municipality or local government may be held liable – in a "*Monell* claim" – when the execution of a policy or custom of such municipality or government "inflicts the injury" for which the plaintiff seeks redress. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *see Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003). *Monell* represents an exception to the general rule that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka*, 481 F.3d at 210 (citations and quotations omitted). Under *Monell*, a municipality – or a private corporation contracted by the municipality – may be held liable when the execution of a policy or custom of such municipality or corporation "inflicts the

- 15 -

injury" for which the plaintiff seeks redress. *Monell*, 436 U.S. at 694; *see Natale*, 318 F.3d at 584.[19]

Defendants aver that they are state actors and that Plaintiff has not demonstrated a "custom, practice or policy related to constitutional harms for following Department policy." (Doc. 100, at 31). Plaintiff argues that the Defendants failed to act despite the need presented by the DOC's intake and suicide evaluations. (Doc. 101, at 20). The record supports the notion that Defendants Harry, Malishchak, and Herb implemented Department policy; however, there is a question as to whether these Defendants were "appropriate officer[s]" or "policymaker[s]." *See Natale*, 318 F.3d at 584. Plaintiff claims that the Defendants are liable because "the[y, as] policymaker[s] ha[ve] failed to act affirmatively at all, [though] the need to take some action to control the agents of the government '[was] so obvious, and the inadequacy of existing practice [was] so likely to result in the violation of constitutional rights, that the policymaker[s] can reasonably be said to have been deliberately indifferent to the need." (Doc. 101, at 20); *Natale*, 318 F.3d at 584 (*citing Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 417-18 (1997) (Souter, J., dissenting)).

"'The question of who is a policymaker is a question of state law', to be addressed by a court, not a jury, in 'determin[ing] which official has final, unreviewable discretion to make a decision or take an action.'" *B.S. v. Somerset Cty.*, 704 F.3d 250, 275 n. 36 (3d Cir.2013) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1481 (3d Cir. 1990)). In order to determine

---

[19] To establish a 'policy,' a plaintiff must show that "a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." *Natale*, 318 F.3d at 584 (internal quotation marks omitted) (brackets in original). To establish a 'custom,' a plaintiff must allege "an act that has not been formally approved by an appropriate decisionmaker, but that is so widespread as to have the force of law." *Natale*, 318 F.3d at 584 (internal quotation marks omitted).

whether an official is a policymaker the court must assess "(1) whether, as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question, ... and (2) whether the official's authority to make policy in that area is final and unreviewable." *Kocher v. Larksville Borough*, 926 F. Supp. 2d 579, 606 (M.D. Pa. 2013) (internal citations omitted).

Neither party indicates any evidence in the record supporting whether Defendants Harry, Malishchak, and Herb possessed final policy making authority regarding the mental health evaluations of prisoners at SCI Camp Hill. (Doc. 100; Doc. 101). Defendant Malishchak agreed that he "provide[d] education for nurses," including policy, but there is no indication in the record that he drafted this policy personally. (Doc. 99-3, at 7). Defendant Herb stated that she provided guidance to the nurses to ensure that they were "following policy and procedure," but did not indicate that she drafted such policies. (Doc. 99-7, at 4). There is no evidence that Defendants Malishchak or Herb made "policy in the particular area of municipal business in question [or had] . . . final and unreviewable [authority to create such policies]." *See Kocher*, 926 F. Supp. 2 at 606; *see also A.M. ex rel. J.M.K. v. Luzerne Cty. Juv. Det. Ctr.*, 372 F.3d 572, 585-86 (3d Cir. 2004) (permitting a theory of policymaking liability when "[e]vidence in the record show[ed] that [the Defendants] had responsibility for developing policies and procedures for the [Juvenile Detention] Center").

Defendant Harry stated that she would sometimes meet with a supervisor to discuss "something that we were changing [like] a policy or procedure." (Doc. 99-2, at 6). However, the record lacks evidence supporting the notion that Defendant Harry possessed final and unreviewable policy making authority. *See Kocher*, 926 F. Supp. 2 at 606. As such, there is no evidence in the record to support that Defendant Harry drafted the mental health policies to

- 17 -

which Decedent was subject to nor whether her authority was final. *See Kocher*, 926 F. Supp. 2 at 606; *see also Santiago v. Warminster Tp.*, 629 F.3d 121, 135 n.11 (3d Cir. 2010) (stating that a plaintiff is "not relieve[d] of her . . . obligation to plead in some fashion that [the Defendant] had final policy making authority, as that is a key element of a *Monell* claim" even though such an issue is of a legal rather than factual nature). Thus, because Plaintiff has not sufficiently demonstrated in the record that Defendants "established a policy, practice, or custom that directly caused the harms that [were] allegedly endured," she has failed to establish an issue of fact regarding the *Monell* claim against Defendants. *See Phillips*, 687 F. App'x at 131. Therefore, summary judgment is GRANTED in favor of Defendants Herb, Malishchak, and Harry.

D. Conspiracy

Defendants allege that they are entitled to summary judgement on Plaintiff's conspiracy claim "[b]ecause there is no underlying constitutional violation, and because there is nothing in the record that supports that circumstances were falsified or an agreement was formed."[20] (Doc. 100, at 34). Plaintiff states that "the actions of the defendants show that they all knew that they were deliberately violating their own policies and protocols . . . and did absolutely nothing to rectify their deliberate indifference to their policy violations." (Doc. 101, at 21).

---

[20] Defendants correctly note that Defendant Kephart and Defendant Smith were terminated from this action by the Court's order on March 9, 2020. (Doc. 85). Therefore, Plaintiff's claims against them were not proper to include in her amended complaint. (Doc. 86, at 13). Summary judgment is GRANTED as to the claims against Defendants Kephart and Smith.

In order to prevail on a conspiracy claim under § 1983, Plaintiff must prove that persons acting under color of state law conspired to deprived her husband of a federally protected right. *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 547 (D.N.J. 2013), *aff'd sub nom. Estate of Martin v. U.S. Marshals Serv. Agents*, 649 F. App'x 239 (3d Cir. 2016); s*ee White v. Brown*, 408 F. App'x 595, 599 (3d Cir.2010) (*citing Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir.1999)). The grant of summary judgment is proper on such a claim where a plaintiff cannot establish an underlying violation of any constitutional rights. *See Young v. County of Fulton*, 160 F.3d 899, 904 (2d Cir.1998) ("There was no deprivation of a federal constitutional right, and therefore there can be no civil rights conspiracy to deprive that right. Therefore, summary judgment is GRANTED in favor of Defendants regarding Plaintiff's conspiracy claim.

IV.   **CONCLUSION**

For the reasons set forth herein, Defendants' Motion for Summary Judgment is **GRANTED**. (Doc. 98).

An appropriate Order follows.

Dated: February 25, 2021

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**